UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


BEARING CONSTRUCTION INC.,             *
805 Shine Smith Road
Sudlersville, Queen Anne's County, Maryland 21668, *

             Plaintiff          *
v.                                   Civil Action No. _____
                             *
AERONAUTICA WINDPOWER, LLC,
11 Resnick Road                  *
Plymouth, Massachusetts 02360

                             *

     Serve: Mr. Michael Glynn
          Aeronautica Windpower, LLC   *
          11 Resnick Road
          Plymouth, Massachusetts 02360  *


                             *

WESTCHESTER FIRE INSURANCE COMPANY,
436 Walnut Street               *
Philadelphia, PA 19106

                             *

     Serve: Mr. Alfred W. Redmer, Jr.
          Insurance Commissioner     *
          200 St. Paul Place, Suite 2700
          Baltimore, MD 21202       *

          Defendants.          *


## COMPLAINT

COMES NOW plaintiff BEARING CONSTRUCTION INC. and submits its Complaint

against defendants AERONAUTICA WINDPOWER, LLC and WESTCHESTER FIRE

INSURANCE COMPANY for breach of contract, stating as follows:

1. Plaintiff Bearing Construction Inc. (hereinafter, "Bearing") is a corporation organized under the laws of the State of Maryland having its principal place of business at 805 Shine Smith Road, Sudlersville, Queen Anne's County, Maryland 21668.

2. Defendant Aeronautica Windpower, LLC ("Aeronautica") is a limited liability company organized under the laws of the Commonwealth of Massachusetts having its principal place of business at 11 Resnick Road, Plymouth, Massachusetts 02360. Aeronautica is not registered to do business in Maryland, but Aeronautica regularly and presently does business in Maryland, including among other business the business which is the subject of this Complaint. Aeronautica is subject to the personal jurisdiction of this Court.

3. Defendant Westchester Fire Insurance Company ("Westchester" or "the surety") is a corporation organized under the laws of the Commonwealth of Pennsylvania having its principal place of business at 436 Walnut Street, Philadelphia, Pennsylvania 19106. Westchester is registered to do business in Maryland, and regularly and presently does business in Maryland, including among other business the business which is the subject of this Complaint. Westchester is subject to the personal jurisdiction of this Court.

4. The Court's jurisdiction is based upon 28 U.S.C. §1332(a), there being diversity of citizenship between plaintiff and the defendants and an amount in controversy in excess of $75,000, exclusive of interest and costs.

5. On or about June 13, 2013, Bearing entered into a written contract ("the Prime Contract") with the City of Crisfield, Maryland for the construction of the "Crisfield Wind Energy Project" ("the Project"). A copy of the Prime Contract in pertinent part is attached hereto as Exhibit A. The Contract Documents of the Prime Contract included General Conditions, specifications, drawings and other documents.

6.  On or about August 30, 2013, Bearing entered into a written contract ("the Subcontract") with Aeronautica for Aeronautica to supply to Bearing in strict accordance with the Contract Documents certain equipment and materials comprising a wind turbine that was required for the Project.  A copy of the Subcontract in pertinent part is attached hereto as Exhibit B.

7.  The Subcontract required Aeronautica among other requirements to provide Bearing with a Supply Bond ("the Supply Bond") for the full amount of the subcontract price, naming Bearing as the bond's beneficiary.  Aeronautica provided a bond whereby Westchester undertook, to the extent of the amount of the bond, to act as surety for Aeronautica's performance of the Subcontract.  A copy of the Supply Bond is attached hereto as Exhibit C.

8.  By incorporation into the Subcontract, the Contract Documents required Aeronautica to complete its work in time for Bearing to achieve completion of the entire Project within 365 calendar days after the Owner's issuance of a notice to proceed.  The notice to proceed was issued in December 2014, and the required date of completion was established as December 31, 2014.

9.  Aeronautica delivered one component of the wind turbine, the tower, to the jobsite in Crisfield, Maryland on October 24, 2014.

10.  The City of Crisfield granted an extension of time for completion of the Prime Contract through May 22, 2015 by means of Contract Change Order No. 2 dated February 18, 2015.  A copy of the change order is attached hereto as Exhibit D.

11.  Aeronautica failed to deliver the components (other than the tower mentioned above in paragraph 9) timely.  Bearing made repeated demands upon Aeronautica for performance and issued repeated requests for information about Aeronautica's efforts to achieve completion.

Aeronautica failed to provide most of the requested information but issued repeated assurances of completion by various dates.

12.  Aeronautica failed to meet every one of the dates of completion that it promised over time.  As of the date of filing of this Complaint, Aeronautica still has failed to deliver the components other than the tower.

## Count One: Breach of Contract

13.  The foregoing allegations of paragraphs 1 through 12 of this Complaint are incorporated into this Count One as if fully set forth herein.

14.  Aeronautica's failure to meet the date of completion required by the Subcontract is a breach of the Subcontract and has caused and will cause Bearing damages in excess of $120,000.00.

WHEREFORE, plaintiff Bearing Construction Inc. requests that the Court enter judgment in its favor and against defendant Aeronautica Windpower, LLC in such amount of damages as shall be shown at trial, and not less than $120,000.00.  Plaintiff further requests that the Court award it the costs of this action and a reasonable fee for its attorney.

## Count Two

15.  The foregoing allegations of paragraphs 1 through 14 of this Complaint are incorporated into this Count Two as if fully set forth herein.

16.  On September 28, 2015, Bearing (by counsel) addressed a letter to Aeronautica and Westchester declaring Aeronautica to be in default of its Subcontract and calling upon Aeronautica and the surety to provide information and documentation of Aeronautica's efforts

and capability to cure the default.  On November 4, 2015, having received no satisfactory

response from Aeronautica or its surety, Bearing (by counsel) addressed a letter to Aeronautica

and Westchester calling upon those parties to bring the project to the soonest possible

completion, warning of those parties' liability for damages for breach of the Subcontract and the

Supply Bond, and reiterating the request for information and documents set forth in its letter

dated September 28, 2015.  Copies of these letters are attached hereto as Exhibit E.

17.  The Supply Bond provided, inter alia, that action upon the bond must be brought  and

process served upon the surety prior to the expiration of one year from the date fixed in the

Subcontract for the completion thereof, i.e., prior to December 31, 2015.  This action will be

filed and served timely.

18.  Westchester's failure to compensate Bearing for its damages incurred as the result of

Aeronautica's default is a breach of the Supply Bond and has caused and has caused and will

cause Bearing damages in excess of $120,000.00.

WHEREFORE, plaintiff Bearing Construction Inc. requests that the Court enter judgment

in its favor and against defendant Westchester Fire Insurance Company in such amount of

damages as shall be shown at trial, and not less than $120,000.00.  Plaintiff further requests that

the Court award it the costs of this action and a reasonable fee for its attorney.

Respectfully submitted,

Dated:  December 10, 2015

Christopher L. Grant
Attorney at Law
Bar ID 10941
1250 Connecticut Ave., NW, Suite 200
Washington, DC  20036
Tel. (202) 737-0981
Fax (202) 737-0982
lawgrant@mindspring.com
Attorney for Plaintiff

187A019

SECTION 00530

AGREEMENT

THIS AGREEMENT, made this 13TH day of June _____ , 2013, by and between the City of Crisfield, hereinafter called "OWNER", and Bearing Construction, Inc., doing business as a Corporation, hereinafter called "CONTRACTOR".

WITNESSETH; That for and in consideration of the payments and agreements herein after mentioned:

1.   The CONTRACTOR will commence and complete the construction of **Crisfield Wind Energy Project, Contract No. 187A019**.

2.   The CONTRACTOR will furnish all of the materials, supplies, tools, equipment, labor, and other services necessary for the construction and completion of the PROJECT described herein.

3.   The CONTRACTOR will commence the work required by the CONTRACT DOCUMENTS within 10 calendar days after the date of the NOTICE TO PROCEED and will complete all work within 365 consecutive calendar days thereafter.

4.   The CONTRACTOR agrees to perform all of the WORK described in the CONTRACT DOCUMENTS and comply with the terms therein for the sum of $3,200,000.00.

or as shown in the BID schedule.

5. The Term "CONTRACT DOCUMENTS" means and includes the following:

    (A) INVITATION TO BIDDERS

    (B) INFORMATION FOR BIDDERS

    (C) BID

    (D) BID BOND

    (E) AGREEMENT

    (F) GENERAL CONDITIONS

    (G) PAYMENT BOND

AGREEMENT                                                                                                    00530-1

**Exhibit A**

187A019

(H) PERFORMANCE BOND

(I) NOTICE OF AWARD

(J) SPECIFICATIONS prepared or issued by Davis, Bowen &

Friedel, Inc.

(K) PLANS prepared or issued by Davis, Bowen & Friedel, Inc.

(L) APPENDICES

(M) ADDENDA:

No. 1, dated November 30, 2012

No. 2, dated December 3, 2012

No. 3 dated December 21, 2012

No. 4 dated December 28, 2012

No. 5 dated January 2, 2013

6. The OWNER will pay to the CONTRACTOR, in the manner and at such times as set forth in the General Conditions, such amounts as required by the CONTRACT DOCUMENTS.

7. This Agreement shall be binding upon all parties hereto and their respective heirs, executors, administrators, successors, and assigns.

AGREEMENT                                                                                    00530-2

187A019

IN WITNESS WHEREOF, the parties hereto have executed or caused to be executed by their duly authorized official, this Agreement in <u>four (4)</u> copies each of which shall be deemed an original on the date first above written.

OWNER: ____City of Crisfield____

BY: _____

(SEAL)

NAME: ____Percy J. Purnell____
(Please Type)

TITLE: ____Mayor____

ATTEST _____

NAME: _____
(Please Type)

TITLE: ____Clerk Treasurer____

CONTRACTOR: Bearing Construction, INC.

BY: _____

NAME: ____James Merrell, President____
(Please Type)

(SEAL)

ADDRESS: ____805 Shine Smith Road____

____Sudlersville, Maryland 21668____

____52-2252253____
(Employer Identification No.)/(License No.)

ATTEST _____

Name: ____LESLIE Miller____
(Please Type)

Title: ____CORPORATE SECRETARY____

END OF SECTION

AGREEMENT

00530-3

CONTRACT DOCUMENTS

CONTRACT NO. 187A019

**CRISFIELD WIND ENERGY PROJECT**

FOR THE

**CITY OF CRISFIELD**

**SOMERSET COUNTY, MARYLAND**

**7**

Prepared by:

DAVIS, BOWEN & FRIEDEL, INC.
One Plaza East, Suite 200
P.O. Box 93
Salisbury, MD 21803
410-543-9091

SEPTEMBER 2012

SECTION 00800

GENERAL CONDITIONS

TABLE OF CONTENTS

| Item Description | | Page No. |
|---|---|---|
| 1. | GENERAL | 3 |
| 2. | DEFINITIONS OF TERMS | 3 |
| 3. | DRAWINGS AND SPECIFICATIONS | 6 |
| 4. | CONTRACT TIME | 6 |
| 5. | SUBCONTRACTING | 7 |
| 6. | CONTRACTOR'S AND SUBCONTRACTOR'S INSURANCE | 7 |
| 7. | SAFETY AND HEALTH REGULATIONS FOR CONSTRUCTION | 9 |
| 8. | TESTS AND INSPECTIONS | 9 |
| 9. | WORKING TIME | 9 |
| 10. | PROTECTION OF PROPERTY AND STRUCTURES | 10 |
| 11. | FORCE ACCOUNT WORK | 11 |
| 12. | PAYMENTS TO CONTRACTOR | 12 |
| 13. | SCHEDULES, REPORTS AND RECORDS | 12 |
| 14. | ELIMINATED ITEMS | 13 |
| 15. | CONTRACTOR'S LEGAL ADDRESS | 13 |
| 16. | ORDERING MATERIALS | 13 |
| 17. | BUILDING CODES | 13 |
| 18. | LAWS TO BE OBSERVED | 14 |
| 19. | EQUAL OR APPROVED EQUAL | 14 |
| 20. | PERMIT REQUIREMENTS | 14 |
| 21. | LOCATION OF EXISTING UTILITIES | 15 |
| 22. | EXISTING WATER AND SEWERAGE SYSTEMS | 15 |
| 23. | COOPERATION WITH OTHER CONTRACTORS | 15 |
| 24. | TEST BORING AND/OR SUBSURFACE CONDITIONS SHOWN ON DRAWINGS | 15 |
| 25. | AS-BUILT DRAWINGS | 16 |
| 26. | CONTRACTOR RESPONSIBILITY TO COORDINATE ALL SERVICES | 16 |
| 27. | EROSION AND SEDIMENT CONTROL | 16 |
| 28. | PERMITS, FEES AND NOTICES | 16 |
| 29. | PATENTS | 17 |
| 30. | DRAWINGS TO BE FOLLOWED | 17 |
| 31. | INTERPRETATION OF DRAWINGS | 17 |
| 32. | ALTERATION OF DRAWINGS AND CHARACTER OF WORK | 17 |
| 33. | ENGINEER MAY INCREASE AND DECREASE QUANTITIES | 18 |
| 34. | UNAUTHORIZED WORK | 18 |
| 35. | EXECUTION OF WORK | 18 |
| 36. | COOPERATION OF CONTRACTOR AND REPRESENTATIVE | 18 |
| 37. | EMPLOYEES AND EQUIPMENT | 19 |
| 38. | SANITARY PROVISIONS | 19 |
| 39. | PUBLIC CONVENIENCE AND SAFETY | 19 |
| 40. | BARRICADES, DANGER, WARNING, AND DETOUR SIGNS | 20 |
| 41. | CONTRACTOR'S RESPONSIBILITY FOR WORK | 20 |
| 42. | USE OF A SECTION OF THE WORK | 21 |
| 43. | TEST OF SAMPLES OF MATERIALS | 21 |
| 44. | QUALITY OF MATERIALS AND WORKMANSHIP | 21 |
| 45. | AUTHORITY OF ENGINEER | 21 |
| 46. | AUTHORITY AND DUTIES OF RESIDENT PROJECT REPRESENTATIVE | 21 |
| 47. | INSPECTION OF MATERIALS AND WORK | 22 |

| | | |
|---|---|---|
| 48. | DEFECTIVE MATERIALS AND WORK | 22 |
| 49. | FAILURE TO REMOVE AND RENEW DEFECTIVE MATERIALS AND WORK | 22 |
| 50. | TEMPORARY SUSPENSION OF WORK | 22 |
| 51. | ANNULMENT OF CONTRACT | 23 |
| 52. | MEASUREMENT OF QUANTITIES | 24 |
| 53. | PAYMENT FOR MATERIALS WHEN PAYMENT IS NOT MADE BY CONTRACTOR | 24 |
| 54. | NO ESTOPPEL OR WAIVER OF LEGAL RIGHTS | 25 |
| 55. | CLAIMS FOR EXTRA COMPENSATION | 25 |
| 56. | EXTRA WORK RELATING TO CONTRACT | 26 |
| 57. | SCOPE OF PAYMENTS | 26 |
| 58. | PARTIAL PAYMENTS | 26 |
| 59. | PAYMENTS MAY BE WITHHELD | 27 |
| 60. | CONDITIONAL ACCEPTANCE OR SUBSTANTIAL COMPLETION | 27 |
| 61. | UNLIMITED LIABILITY OF CONTRACTOR | 28 |
| 62. | CUMULATIVE REMEDIES | 28 |
| 63. | FAILURE TO COMPLETE WORK ON TIME | 28 |
| 64. | PROJECT MEETINGS | 28 |
| 65. | GUARANTEE MAINTENANCE BOND | 29 |
| 66. | OPERATOR TRAINING | 29 |
| 67. | STORAGE OF MATERIALS | 29 |
| 68. | SURVEYS AND CONSTRUCTION STAKE-OUT | 29 |
| 69. | NOTIFICATION OF WORK REQUIRED | 30 |
| 70. | EXTRA WORK | 30 |
| 71. | START-UP AND TESTING | 31 |
| 72. | GUARANTEE | 31 |
| 73. | MAINTENANCE, REPAIRS, ETC., AFTER COMPLETION | 31 |
| 74. | EXTENSION OF TIME | 32 |
| 75. | CONTRACT CLOSEOUT | 33 |

SECTION 00800

## GENERAL CONDITIONS

1.     General

The ENGINEER is the firm of Davis, Bowen and Friedel, Inc. acting for the OWNER as his duly authorized agent, said agent acting severally within the scope of duties contracted with the OWNER.

Wherever the word ENGINEER appears in the Contract Documents, it is defined to mean the firm of Davis, Bowen & Friedel, Inc. One Plaza East, Suite 200, P.O. Box 93, Salisbury, Maryland 21801.

Wherever the word OWNER appears in the Contract Documents, it is defined to mean the City of Crisfield, 319 West Main Street, Crisfield, Maryland 21817.

It is the intent of the Specifications and Drawings to describe a complete PROJECT to be constructed in accordance with the Contract Documents. The Contract Documents comprise the entire Agreement between OWNER and CONTRACTOR.   They may be altered only by a modification.

The Contract Documents are complementary: what is called for by one is as binding as if called for by all.   If the CONTRACTOR finds a conflict, error, or discrepancy in the Contract Documents, he shall call it to the ENGINEER'S attention in writing at once and before proceeding with the work affected thereby; however, he shall not be liable to the OWNER or ENGINEER for his failure to discover any conflict, error, or discrepancy in the Specifications or Drawings.   In resolving such conflicts, errors, and discrepancies the documents shall be given precedence in the following order: Agreement, Modifications, Addenda, Special Conditions, General Conditions, Information for Bidders, Specifications and Drawings. Figure dimensions on Drawings shall govern over scale dimensions, and detailed Drawings shall govern over General Drawings.   Any work that may reasonably be inferred from the Specifications or Drawings as being required to produce the intended result shall be supplied whether or not it is specifically called for.   Work, materials, or equipment described in words which so applied have a well-known technical or trade meaning shall be deemed to refer to such recognized standards. The work to be done under these specifications is to cover the completed work shown on the plans or called for in the specifications and other contract documents. The CONTRACTOR shall furnish all implements, machinery, tools, equipment, material and labor necessary to the performance of the work and shall furnish and do everything necessary to make the work perfect, complete, neat and finished, and the CONTRACTOR shall leave all the work to be done under this Contract in this condition at the time the work is finally inspected.

2.     Definitions of Terms

A.     Whenever in these Specifications, Proposals, Agreement, Bond and other Contract Documents, the following terms or pronouns in place of them are used, the intent and meaning shall be interpreted as follows:

"OWNER" or "City of Crisfield"
City of Crisfield, located in Somerset County, Maryland.

"ENGINEER" and "ARCHITECT"
Consultant ENGINEER or ARCHITECT for OWNER or his duly authorized representative.   Wherever the word ENGINEER or ARCHITECT is referred to in these

specifications it can be substituted with the word "OWNER" and he can at all times assume the responsibilities of the ENGINEER or ARCHITECT. Throughout these documents the words ENGINEER and ARCHITECT may be used interchangeably, each having the full authority described for the ENGINEER or ARCHITECT.

"Resident Project Representative"
An authorized representative of the OWNER or ENGINEER or ARCHITECT assigned to make any and all necessary observations of the work performed and materials and/or equipment furnished by the CONTRACTOR.

"Contractor"
Party responsible for constructing the work, acting directly or through his agents or employees.

"Subcontractor"
Any individual, firm or corporation who contracts with a CONTRACTOR to perform part or all of the latter's contract.

"Shop Drawings"
Drawings, diagrams, illustrations, schedules, performance charts, brochures and other data which are prepared by the CONTRACTOR or any SUBCONTRACTOR, manufacturer, supplier or distributor, and which illustrate some portion of the work.

"Drawings"
All drawings or reproduction of drawings, pertaining to the work under the contract, which are furnished or approved by the ENGINEER.

"Specifications"
The definitions, descriptions, directions, provisions and requirements, contained herein, and all written supplements thereto, made or to be made, pertaining to the contract, and the materials, equipment, and workmanship to be furnished under the contract.

"Contract" or "Contract Documents"
All things contained in the specifications, drawings, proposals, agreement and bond, and therein referred to, are to be considered as one instrument forming the contract, also any and all supplemental agreements which could reasonably be required to complete the construction contemplated.

"Approved", "As Required", and similar expressions
Meaning shall be construed as "as approved by the ENGINEER" and "as required by the ENGINEER".

"Provide"
A direction to the CONTRACTOR to furnish all materials, equipment and labor and make payment for all of these necessary to complete the contract.

"Work"
Any and all things agreed to be furnished or done by or on the part of the CONTRACTOR, and which are required in the construction and completion of the PROJECT herein contemplated. Includes also labor, material and equipment.

### "Material" or "Materials"

Unless the context otherwise requires, these words or either of them, shall include equipment.

### "Furnish"

A direction to the CONTRACTOR to supply and make payment for materials and equipment but not necessarily to install or pay workmen to install, or both, these items.

### "General Conditions"

Provisions that establish and pertain to the legal responsibilities between the parties involved in the work, namely OWNER, ENGINEER and CONTRACTOR.

### "Surety"

The body corporate, approved by the OWNER, which is bound with and for the CONTRACTOR who is primarily liable, and which engages to be responsible for his acceptable performance of the work for which he has contracted.

### "Force Account"

Work, for which no price has been negotiated, that has been performed by the CONTRACTOR, by order of the ENGINEER, under emergency conditions. The order shall be confirmed in writing.

### "BIDDER"

Any individual, firm or corporation submitting a bid for the work contemplated, acting directly or through a duly authorized representative.

### "Bid"

The approved prepared form on which the BIDDER is to submit or has submitted his bid for the work contemplated.

### "Certified Check"

The check attached to a bid, drawn upon a solvent clearing house bank, and guaranteed by the bank to be good as to the signature and amount indicated on face. It is a substitute for a bid bond.

### "Supplementary or Special Conditions"

Provisions specifically applicable to this work.

### "General Requirements"

Instructions to the General CONTRACTOR relating to non-legal non-technical requirements for proper execution of the field work. These are instructions that cannot logically be placed anywhere else in the bidding documents.

### "Acts of God"

A cataclysmic phenomenon of nature. Climatic and subsurface conditions of which may be abnormal for the area over all or part of the time span of the work, but which do not preclude prosecution of the work with the proper use of specified methods and equipment, shall not be considered as acts of God.

### "Bond" or "Contract Bond"

The form of security to be approved by the OWNER, furnished by the CONTRACTOR and his Surety in accordance with the form attached hereto.

"Notice to Proceed"
A notice to the CONTRACTOR of the date on which he is to begin the execution of work for which he has a contract.

B.    The headings and subheadings printed in these specifications are intended for convenience or reference only, and shall not be considered as having any particular bearing on the interpretation thereof.

C.    The drawings accompanying these specifications shall be held and taken to be "attached" hereto, whether or not said drawing is physically attached hereto.

D.    Wherever the words "directed", "required", "ordered", "approved", "acceptable", or others of like import appear in the specifications, they shall mean as directed, required, ordered, approved or acceptable by or to the OWNER and by or to the ENGINEER acting as the OWNER'S agent.

3.    Drawings And Specifications

A.    All reference to regulatory or industry standards appearing on the drawings or in the specifications shall mean the current edition. Where, in the specifications which follow, a standard is cited next to the name of a product or a test procedure, the product or test procedure shall conform to that standard.

B.    Five (5) sets of drawings and specifications will be furnished the CONTRACTOR without charge. Additional sets will be furnished at cost stated in the advertisements for bid.

C.    The CONTRACTOR shall maintain, at the job site, one complete set of drawings and specifications. The CONTRACTOR shall record on this set and keep current, all authorized changes and field adjustments. The set shall be kept available for inspection by representatives of the OWNER and the ENGINEER, and shall finally be used to assist in the preparation of as-built drawings.

D.    Locations of overhead and underground utilities shown on the drawings were derived from existing records and from field observations, in order to provide the CONTRACTOR with as much information as could reasonably be ascertained without actually excavating and exposing subsurface utilities. The OWNER and the ENGINEER do not warrant or guarantee the accuracy of the information shown. Some utilities may not be shown, and the location of those shown may not be entirely accurate.

E.    All incidental items of labor and materials not specifically delineated by the Contract Documents, but which are necessary to provide a fully operable facility, and which may reasonably be interpreted as being a part of the work, shall be accomplished by the CONTRACTOR without extra charge, the prices of which shall be included within the base bid items.

4.    Contract Time

A.    The proposal states the number of consecutive work days allowed from date of "Notice to Proceed" to date of completion of the entire PROJECT under this Contract. For each and every day that the CONTRACTOR is in default in completing the Contract, as defined in the General Conditions and the bid, he shall pay the OWNER liquidated damages in the amount stated in the Bid Form.

B. The OWNER reserves the right to take either or both of the following actions at any time, that in his judgment, it appears the scheduled completion date will not be met:

1. Require the CONTRACTOR to assign additional construction forces to the work.

2. Delete all or any portion of remaining work from this Contract and assign such work to another CONTRACTOR or accomplish same by any other method which may appear most advantageous.

These remedies are supplementary to all other provisions of the specifications and do not void such other provisions.

5. Subcontracting

A. The CONTRACTOR shall submit, prior to commencement of construction, for review by the ENGINEER and the OWNER, a final list of SUBCONTRACTORS, including SUBCONTRACTOR name, the portion of work which he is to do, his place of business, and any other information the ENGINEER may require, as well as materials and equipment suppliers with whom he intends to contract. If the OWNER or the ENGINEER objects to any proposed SUBCONTRACTOR, materials or equipment supplier, the CONTRACTOR shall furnish such data as may be required to secure the OWNER'S and ENGINEER'S approval. If such approval is not then forthcoming, the OWNER and the CONTRACTOR will negotiate the matter to a mutually acceptable conclusion, which negotiations may include a decrease or increase in contract price.

B. The CONTRACTOR shall not, either legally or equitably, assign any of the monies payable under the contract, or his claims thereto, unless by and with the like consent of the ENGINEER.

C. The CONTRACTOR shall not be released from any of his liabilities or obligations under this contract should any SUBCONTRACTOR or SUBCONTRACTORS fail to perform in a satisfactory manner the work undertaken by him or them.

6. Contractor's And Subcontractor's Insurance

A. The CONTRACTOR shall not commence work under this contract until he has obtained all the insurance required under this paragraph and such insurance has been approved by the OWNER, nor shall the CONTRACTOR allow any SUBCONTRACTOR to commence work on his subcontract until the insurance required of the SUBCONTRACTOR has been so obtained and approved.

B. Compensation and Employer's Liability Insurance

The CONTRACTOR shall take out and maintain during the life of the contract the statutory Workmen's Compensation and Employer's Liability Insurance for all his employees to be engaged in work on the PROJECT under the contract shall and, in case any such work is sublet, the CONTRACTOR shall require the SUBCONTRACTOR similarly to provide Workmen's Compensation and Employer's Liability Insurance for all the latter's employees to be engaged in such work.

C. General Public Liability and Property Damage Liability Insurance

GENERAL CONDITIONS                                                                                              00800-7

contract, nor shall they invalidate any of the provisions thereof. Should such alterations in the drawings or in the character of work, or both, cause increased or decreased cost to the CONTRACTOR, a fair and equitable sum therefore, to be agreed upon in writing by the CONTRACTOR and ENGINEER before such work is begun, shall be added or deducted from the contract price. No allowance will be made for anticipated profits on the work omitted.

33. Engineer May Increase and Decrease Quantities

A. Whenever the estimated quantities of work to be done and materials to be furnished on a unit price basis under this contract are shown in any of the documents including the bid, they are given for use in comparing bids. The ENGINEER reserves the right to increase and decrease the amount or quantity of unit price items included in the bid wherever he deems it advisable or necessary to do so, and such increase or decrease shall in no way violate the contract.

B. The CONTRACTOR will be paid for the actual amount of quantity of authorized work done or materials furnished under any unit price item of the "Bid or Proposal", at the price bid and stipulated for such item. In case the amount or quantity of any item is increased as above provided, the CONTRACTOR shall not be entitled to any damages or increased compensation over and above the price bid for such items, and in case the amount or quantity of any item is diminished as above provided, the CONTRACTOR shall not have any claim for damages due to loss of anticipated profits or otherwise because of such diminution.

34. Unauthorized Work

Work performed without ENGINEER'S approval of lines and grades, work performed beyond the lines and grades shown on the drawings or as given, except as herein provided, and extra work performed without written authority, will be considered as unauthorized and at the expense of the CONTRACTOR. Such work will not be measured by the ENGINEER, nor will payment be made by the OWNER. Work so performed may be ordered, by the ENGINEER removed and replaced at the CONTRACTOR'S expense.

35. Execution of Work

A. The CONTRACTOR shall begin the work to be performed under the contract at the time stated in the Notice to Proceed, provided by the ENGINEER to the CONTRACTOR. The place where the work is to be started will be stated either in this notice to proceed or will be designated on the ground. The work shall be executed from as many different points, in such part or parts and at such times as may be directed, and shall be conducted in such a manner and with sufficient materials, equipment and labor as is considered necessary to insure its completion with the time set forth in the contract.

B. If the work should be discontinued because of unforeseen events, the CONTRACTOR shall immediately notify the ENGINEER. When the CONTRACTOR shall discontinue the work because of a planned stoppage, the stoppage shall not take place until the ENGINEER has authorized such stoppage; and work shall not be resumed until CONTRACTOR notifies ENGINEER 24 hours in advance of starting work again.

36. Cooperation of Contractor and Representative

The CONTRACTOR shall give the work his constant attention to facilitate the progress thereof and shall cooperate with the ENGINEER and OWNER. The CONTRACTOR shall have at all

to the failure on the part of the CONTRACTOR to carry out orders given or perform any or all provisions of the contract. If it should become necessary to stop work for an indefinite period, the CONTRACTOR shall store all materials in such manner that they will not obstruct or impede the traveling public unnecessarily nor become damaged in any way, and he shall take every precaution to prevent destruction, damage or deterioration of the work performed, provide suitable drainage by opening ditches, shoulder drains, etc., and erect temporary structures where necessary. The CONTRACTOR shall not suspend the work without authorization. Neither the failure of the ENGINEER to notify the CONTRACTOR to suspend the work on account of bad weather or other unfavorable conditions, nor permission by the ENGINEER to continue work during bad weather or other unfavorable conditions, shall be a cause for the acceptance of any work which does not comply in every respect with the contract and specifications.

51.    Annulment of Contract

A.    Contract may be annulled if CONTRACTOR defaults in any or all of the following ways:

1.    Failure to begin work at time specified.

2.    Failure to perform the work with sufficient number of workers.

3.    Failure to provide sufficient materials to insure prompt completion of the work, except where extension of time is granted.

4.    Failure to perform the work suitably.

5.    Failure to remove materials of rejected work.

6.    Failure to correct rejected work.

7.    Failure to execute the work in manner acceptable to ENGINEER.

8.    Becoming bankrupt or insolvent, or both.

9.    Allowing a final judgment against him unsatisfied for 48 hours.

10.   Making an assignment for the benefit of creditors.

11.   Failure to pay SUBCONTRACTORS for labor.

12.   Failure to pay for materials supplied.

13.   Persistently disregarding laws, rules, ordinances, regulations, and codes applicable to the work.

14.   Disregarding ENGINEER'S instructions.

15.   Failure to comply, within ten (10) days after CONTRACTOR'S receipt (by certified mail, with return receipt requested) of ENGINEER'S notice of default and ENGINEER'S orders to properly execute the work.

16.   Lapse of CONTRACTOR'S insurance.

17.   Failure to discharge persons per General Condition No. 37.

GENERAL CONDITIONS                                                                          00800-23

B.   ENGINEER may act to annul the contract, because of any or all of CONTRACTOR'S defaults, in the following manner:

1.   Give written notice to CONTRACTOR and/or his surety of details of CONTRACTOR'S default.

2.   Issue certificate to OWNER describing CONTRACTOR'S default.

C.   OWNER, upon receipt of such certificate (preceding paragraph), has full power and authority to terminate CONTRACTOR'S employment and to take possession of the premises; materials, appliances and equipment of the work on the premises.  Certificate shall further empower OWNER to enter into an agreement for completion of said contract according to the terms and provisions thereof, or to utilize other methods shall be deem expedient for completion of the contract in accordance with the drawings and specifications.

D.   The OWNER shall have the right to take the following actions because of any or all of the defaults hereinbefore described:

1.   Withhold without paying interest, such sums of money due CONTRACTOR until OWNER'S claims have been protected.

2.   Deduct monies due the CONTRACTOR equal to amount required to pay OWNER'S expenses for OWNER'S completing the work of the contract.

3.   Pay the defaulted CONTRACTOR an amount equal to the difference between actual cost of OWNER'S completing the contract and the sum which would have been paid CONTRACTOR had he not defaulted, if the cost to complete the work is less than amount owed the defaulted CONTRACTOR.

4.   Collect from the defaulted CONTRACTOR and/or surety an amount equal to the difference between actual cost of OWNER'S completing the contract and the sum which would have been paid the CONTRACTOR had he not defaulted, if the cost to complete the work is more than the amount owed the defaulted CONTRACTOR.

52.   Measurement of Quantities

A.   All work completed under the contract shall be measured by the ENGINEER or the Resident Project Representative according to United States Standard Measures.

B.   In computing tonnage, certified freight weigh-bills or certified weight-slips will be utilized.  Other quantities will be determined according to recognized ENGINEERing practices approved by the ENGINEER or as defined on the drawings.

53.   Payment for Materials When Payment Is Not Made By CONTRACTOR

A.   When persons furnishing labor or material, or both submit notice of completion and conditional acceptance of work, 10 days after such completion and conditional acceptance, CONTRACTOR shall furnish the ENGINEER evidence that payment has been made for such labor and material.  If such evidence is not produced, amounts of claims may be retained from monies due the CONTRACTOR until claims are satisfied or

GENERAL CONDITIONS                                                                    00800-24

50 percent completion, further partial payments shall be made in full; however, previously retained amounts shall not be paid until the construction is substantially completed.

C. A schedule of values of the various parts of the work to be done under lump sum items, shall be agreed upon by the CONTRACTOR and the ENGINEER. Prior to the first monthly payment requisition, the CONTRACTOR shall submit for approval, a proposed breakdown into construction categories of his lump sum bid price. This breakdown shall add up to the full 100 percent value of his lump sum price, and all parts of it shall be covered by the Performance Bond. The approved breakdown shall be used for the purpose of arriving at a basis for monthly estimates.

D. One half the Mobilization will be paid to the CONTRACTOR at the time of first partial payment. The remainder will be proportioned according to work completed and paid as work progresses. Mobilization shall not exceed 5% of the base price bid.

E. Each request for partial payment shall contain CONTRACTOR'S certification that he has paid all SUBCONTRACTORS and Materials men in the same proportion for all work and materials supplied by them at his own receipts.

F. The CONTRACTOR will be compensated monthly only for the materials in-place complete and will not be compensated for materials stored. In the case of lump sum items, monthly compensation will be on the basis of the schedule of values to be agreed upon prior to beginning construction.

59. Payments May Be Withheld

Payments may at any time be withheld if the work is not proceeding in accordance with the contract, or if, in the judgment of the ENGINEER, the CONTRACTOR is not complying with the requirements of the Contract Documents.

60. Conditional Acceptance or Substantial Completion

Whenever, in the opinion of the ENGINEER, the CONTRACTOR shall have the work substantially complete and in an acceptable manner in accordance with the terms of the contract, the CONTRACTOR shall arrange for start-up of each facility individually as outlined in the technical specifications and an inspection of the entire work by the ENGINEER, and upon completion of all repairs or renewals which may appear at the time to be necessary, in the judgment of the ENGINEER, he shall certify to the OWNER in writing as to said acceptance. The aforesaid certificate shall be held and taken to evidence the conditional acceptance of the facility by the OWNER as of the date thereof. The OWNER shall continue to reserve and retain five (5) percentum of the whole value of the work as shown by the said certificate of conditional acceptance, over and above any and all other reservations and/or deductions which the OWNER is, by the terms of the Contract Documents or otherwise, entitled or required to make and retain, and shall hold the said five (5) percentum for a period of one (1) month from and after the date of such certificate of conditional acceptance. The OWNER shall be authorized to apply the whole or any part of said five (5) percentum so retained, to any and all costs of repairs and renewals of the work and appurtenances which may become necessary, in the judgment of the ENGINEER, during such period of one (1) month on account of any failure or defects in said work and appurtenances if due to improper work done or materials furnished by the CONTRACTOR, and if the CONTRACTOR shall fail to make or initiate such repairs or renewals within twenty-four (24) hours after receiving notice from the OWNER to do so. The time of PROJECT completion shall apply to CONTRACTOR obtaining "Conditional Acceptance" of all facilities involved in

87A019

contract.

61.  Unlimited Liability of Contractor

It is understood and agreed that any and all of the duties, liabilities and/or obligations imposed upon or assumed by the CONTRACTOR and the Surety, or either of them, by or under the Contract Documents, shall be taken and construed to be cumulative, and that the mention of any specific duty, liability or obligation imposed upon or assumed by the CONTRACTOR and/or Surety under the Contract Documents shall not be taken or construed as a limitation or restriction upon any or all of the other duties, liabilities and/or obligations imposed upon or assumed by the CONTRACTOR and/or Surety by or under the Contract Documents.

62.  Cumulative Remedies

All remedies provided in the Contract Documents shall be taken and construed to be cumulative; that is, in addition to any and all other remedies provided therein and to any remedies in law or equity which the OWNER would have in any case.

63.  Failure to Complete Work on Time

Permitting the CONTRACTOR to continue and finish the work or any part of it after the time established in the contract for its completion or after the date of which the time for completion may have been extended shall not operate as a waiver by the OWNER of any of its right under this contract, and shall not relieve the surety from its obligation.

64.  Project Meetings

A.  The ENGINEER may keep minutes of project meetings and will distribute copies to all parties present at meeting or listed on a permanent list of concerned parties.

B.  Except as noted below for preconstruction meeting, progress meetings will be scheduled on a regular basis by the ENGINEER.

C.  The ENGINEER may call additional progress meetings at critical times in the PROJECT.

D.  The CONTRACTOR shall schedule the presence of active and critical suppliers, SUBCONTRACTORS, and management personnel at these meetings.

E.  Representatives of the CONTRACTOR'S suppliers and SUBCONTRACTORS shall be persons familiar with the details of the work. They shall be persons authorized to make commitments on matters of work progress, delivery dates, size of labor force, cost and other matters as necessary to expedite the work.

F.  To the maximum extent practical, meetings will be held at the job site or Town Hall.

G.  A preconstruction meeting will be scheduled within ten (10) days after the OWNER has issued the notice to proceed order.

H.  CONTRACTOR shall provide attendance by authorized representatives of the CONTRACTOR and all major SUBCONTRACTORS.

improper work done or materials furnished by the CONTRACTOR.

74. Extension of Time

A. If the CONTRACTOR finds that it will be impossible for him to complete the work on or before the completion date fixed on the contract, he shall at the earliest possible date and at least ten (10) days prior to said date, submit a written request to the ENGINEER for an extension of time for completion of the contract. He shall set forth fully therein the reasons which he believes would justify the ENGINEER to grant his request, and shall set forth a revised detailed progress schedule which shall provide that the remaining work shall be completed on or before the extended completion date therein requested. If the ENGINEER finds that the work was delayed on account of unusual conditions beyond the control of the CONTRACTOR, or that the quantities of work done or to be done are sufficiently in excess of the estimated quantities to warrant additional time, he will, with or without notice to the surety, grant an extension of time for completion to such date as appears to him to be reasonable and proper. This date shall thereafter be as binding upon the CONTRACTOR and surety as if it appeared in the contract originally.

B. If any delay is caused to the CONTRACTOR by specific orders of the ENGINEER to stop work or by the failure of the ENGINEER to provide necessary instruction for carrying on the work or the OWNER to provide necessary right-of-way, such delay will entitle the CONTRACTOR to an equivalent suspension of the liquidated damage. No increase in General Conditions or superintendents' costs will be allowed during the period.

C. When the satisfactory execution and completion of the contract requires more work or materials in greater amounts than set forth in the contract, in a manner that impacts the critical path schedule, the CONTRACTOR shall be entitled to an extension of time. When the CONTRACTOR is thus delayed by conditions beyond his control, the contract time shall be extended equal to the number of calendar days he has been delayed. No increase in General Conditions or superintendent's costs will be allowed during the period.

D. CONTRACTOR shall maintain a rain gage at the site and record precipitation for each 24-hour period.

E. This provision specifies the procedure for determination of time extensions for weather-related delays. In order for the CONTRACTOR to be awarded at a time extension for weather-related delays the following conditions must be satisfied.

   1. The weather experienced at the PROJECT site during the contract period must be found to be unusually severe, that is, more severe that the adverse weather anticipated for the PROJECT location during any given month.

   2. The unusually severe weather must actually cause a delay to the completion of the PROJECT. The delay must be beyond the control and without the fault or negligence of the CONTRACTOR.

   3. The following schedule of monthly anticipated adverse weather delays is based on the National Oceanic and Atmospheric Administration (NOAA) or similar data for the PROJECT location and will constitute the base line for monthly weather time elevations. The CONTRACTOR'S progress schedule must reflect these anticipated adverse weather delays in all weather dependent activities.

GENERAL CONDITIONS

MONTHLY ANTICIPATED ADVERSE WEATHER DELAY DAYS

| JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 8 | 7 | 7 | 8 | 8 | 7 | 5 | 6 | 4 | 6 | 5 | 5 |

4.  Upon acknowledgment of the Notice to Proceed (NTP) and continuing throughout the contract, the CONTRACTOR will record in a daily log the occurrence of adverse weather and resultant impact to normally scheduled work. Actual adverse weather delay data must prevent work on critical activities for 50 percent or more of the CONTRACTOR'S scheduled work day. The number of actual adverse weather delay days shall include days impacted by actual adverse weather, even if adverse weather occurred in the previous month. If the number of actual adverse weather delay days exceeds the number of days anticipated, the ENGINEER will convert any qualifying delays to calendar days, deducting, if applicable, CONTRACTOR'S nonutilized fair weather days and issue a time extension by Change Order.

75.  Contract Closeout

The items listed herein shall be compiled and prepared by the CONTRACTOR prior to completion of all work and delivered within one month of date of substantial completion to the OWNER for his future use. Final retainage payment to the CONTRACTOR will be withheld until all items listed herein are delivered to the OWNER. Submit all items specified herein to the ENGINEER or ARCHITECT for review prior to delivery to the OWNER. All items specified herein shall be submitted to the ENGINEER in accordance with Section 01300, "Submittals". Make any corrections, additions or deletions from the contents thereof as may be required.

A.  Record Drawings

1.  The CONTRACTOR shall keep on a set of reproducible sepia prints, a current record of all changes made during construction, including mechanical and electrical lines and apparatus. The record drawings shall show the location of all permanently concealed work not installed where indicated on the Contract Documents.

2.  Accuracy of information shall be the sole responsibility of the CONTRACTOR. Drawings shall be prepared at the same scale as the Contract Documents. Sepias of the Contract Drawings may be obtained from the ENGINEER. Cost of reproduction and shipping shall be paid for by the CONTRACTOR.

B.  Maintenance Manual (Per Section 01300)

C.  Warranties

Submit all warranties for equipment & appurtenances.

D.  Release of Liens

Affidavits of payments of all bills related to the PROJECT, release of liens, bonding company approvals and consent of surety to final payment.

**BEARING CONSTRUCTION, INC.**
805 Shine Smith Road
Sudlersville, MD 21668
410/556-6100
410/556-6574

 **FILE COPY**

| | | | |
|---|---|---|---|
| **Purchase Order #** | 13160-01 | **Date:** | 8/30/2013 |

**TO:**  Aeronautica Windpower, LLC
11 Resnik Road
Plymouth, MA 02360

**Project:**  CRISFIELD WIND ENERGY PROJECT
CONTRACT NO. 187A019

**Attn:**  Walt Wunder

**Work At:**  City of Crisfield, Maryland
Wastewater Treatment Plant

**Bill To:**  Bearing Construction
805 Shine Smith Road
Sudlersville, MD 21668

**Responsibilities: Aeronautica Windpower**

- Will ship turbine (nacelle, blades and tower) for delivery to City of Crisfield Wastewater Treatment Facility, located at 122 N 7th st., Crisfield, MD 21817 (Lat: 37.983120/Lon: -75.857128) (the "Project site").
- Is not responsible for installation and erection of equipment including the foundation and embedment rings, transformers, and wiring.
- Will provide 2 trained personnel to oversee installation and provide commissioning services on turbine.
- Provide a five (5) year Warranty on the turbine (See Exhibit A)
- Provide a five (5) year Availability Warranty on the turbine (See Exhibit B)

**Description:** Bearing Construction accepts your proposal to Supply in strict accordance with of the contract documents as prepared by Davis, Bowen & Friedel, for The City of Crisfield Maryland Wind Energy Project the 54-750kw Wind Turbine.

All material must be submitted and approved by the contract Engineer and The City of Crisfield.

Attached to this Purchase Order is a CD containing all the drawings, specs and Addendum 1 for this Project. The CD is an integral part of this Purchase Order.

Aeronautica Windpower will provide electronic versions the submittal information and O&M information required for this project. Bearing Construction is responsible for providing the required number of submittals according to the contract. Aeronautica Windpower will provide a current Certificate of Insurance and warranties (see Appendix A)as required.

*Friday, August 30, 2013*

**Exhibit B**





**BEARING CONSTRUCTION, INC.**
805 Shine Smith Road
Sudlersville, MD 21668
410/556-6100
410/556-6574

**Payment Terms:**   55%  - Upon Contract Signature (Order not officially placed until received)
40 % - Prior to Delivery (Product not released until payment is received)
5%   - At Completion of Commissioning

Percentages are based on Total Contract Price listed below.  Transfer of title occurs upon receipt of complete payment for equipment.  Transfer of loss occurs upon delivery of equipment to site.

**Supply Bond:**

Aeronautica shall provide Buyer with a Supply Bond for the full amount of the Contract Price, which Supply Bond shall name Buyer as beneficiary. The Supply Bond shall secure the full scope of performance of this Agreement by Aeronautica and be in the amount of one hundred percent (100%) of the Contract Price and be automatically increased in the amount of any additive to the Contract Price signed by Buyer and Aeronautica which results in an increase in the Contract Price upon thirty (30) days notice to the issuing surety. Buyer aacknowledges and agrees that the Supply Bond does not cover any warranty obligations as outlined in Exhibit A, or performance warranty obligations as outlined in Exhibit B, or any other references, options or material changes to the Turbine Supply Agreement. The Supply Bond shall be provided to Buyer within thirty (30) Calendar Days following execution of this Agreement and shall be released in full on the Delivery Date for the final Turbine Component to be made available.

**Pricing:**

| | |
|---|---|
| Turbine: | $1,299,938 |
| Warranty Extension: | $30,000 |
| 95% Availability Warranty: | $50,000 |
| Supply Bond: | $7,500 |
| Five (5) Year Service Plan: | $122,500 |
| Shipping: | $85 |
| Total Contract Price: | $1 |

See attached General Conditions and Turbine Specification.

Aeronautica Windpower, LLC

Signed: _____
Walt Wunder

Date: ____9/5/13____

Bearing Construction, Inc.

Signed: _____
James R. Merrell

Date: ____8/30/2013____

Exhibit A

FIVE YEAR LIMITED WARRANTY

This Limited Warranty (Warranty) is issued under and in connection with and attached to and made a part of that certain Purchase Order, dated July 15, 2013 (Agreement), by and between Aeronautica Windpower, LLC (Aeronautica) and Bearing Construction Company, as Buyer (Buyer) for the City of Crisfield, MD. This warranty is transferrable to the City of Crisfield upon commissioning.

*Turbine Warranty.* Aeronautica warrants the Aeronautica 54-750kW.65 wind turbine purchased under the Agreement (Wind Turbine), on the terms set forth herein, for the period from the date that is the earlier of the commissioning of the Wind Turbine in accordance with Aeronautica's commissioning procedures, as set forth in the Agreement, and sixty (60) days following the delivery of the Wind Turbine to the Project site (Commencement Date), and continuing until the **fifth (5th) anniversary** of the Commencement Date (Turbine Warranty Period); provided that, notwithstanding the commencement of the Turbine Warranty Period, Aeronautica shall have no obligations or liability under this Warranty until commissioning of the Wind Turbine by Aeronautica in accordance with Aeronautica's commissioning procedures and the terms of the Agreement.

During the Turbine Warranty Period, and subject to the limitations, exclusions and conditions set forth herein and under the Agreement, Aeronautica Windpower warrants to the owner of the Wind Turbine that the Wind Turbine will be free from defects in material and workmanship under normal use.

*Warranty on Replacement Parts.* Aeronautica warrants each replacement part provided by Aeronautica under this Warranty on the terms set forth herein until the expiration of the Turbine Warranty Period or, if later, the first anniversary of, as applicable, the date of shipment of the replacement part from Aeronautica's manufacturing plant (the Replacement Warranty Period).

During the Replacement Warranty Period and subject to the exclusions set forth herein and in the Agreement, Aeronautica warrants to the owner of the Wind Turbine that any such replacement part shall be free from defects in material and workmanship under normal use.

*Exclusions and Conditions.* This Warranty does NOT cover normal wear and tear, including wear and tear due to environment or operations. This Warranty does NOT cover failure due to: over-voltage conditions, interconnection problems, grid conditions outside of Aeronautica's operation, preventative maintenance or instruction manuals, as updated from time to time (Aeronautica Standards); lightning or other conditions outside the operating parameters of the Wind Turbine; misuse or abuse of the equipment; vandalism, theft, malicious mischief, accident or negligence; or any act or omission of the owner of the Wind Turbine, its employees, agents or contractors (or the employees, agents or contractors thereof). This Warranty does NOT cover: the foundation of the Wind Turbine or any other equipment, materials or supplies not manufactured or supplied by Aeronautica, or any Wind Turbine components or equipment relocated from their original place of installation. For this Warranty to remain in effect, the Wind Turbine must have been and remained commissioned, stored, installed, operated and maintained properly and in accordance with Aeronautica Standards. *Any operation, preventative maintenance, repairs, replacements or modifications to the Wind Turbine made or undertaken by a party other than Aeronautica or its agents will void this warranty.* Without limiting the generality of the foregoing, all operation, preventive maintenance, repairs, replacements and modifications to the Wind Turbine during

the applicable warranty periods must be conducted by Aeronautica or its agents pursuant to an operation and preventive maintenance services agreement. For operation, preventive maintenance, repairs, replacements and modifications undertaken by Aeronautica or its agents, Aeronautica will cause proper records of such work to be maintained and will promptly provide copies of such records to the Buyer or its agents.

*Warranty Claims*. In the event that a claim under this Warranty arises, the owner of the Wind Turbine shall promptly provide Aeronautica with a written notice describing such claim in detail and providing any supporting information. The owner shall promptly provide all additional information requested by Aeronautica relating to the claim and, if requested by Aeronautica, shall provide Aeronautica or its agents adequate access to the Wind Turbine and related equipment and/or promptly remove any defective part and make it available for repair or replacement at a location designated by Aeronautica. As soon as practicable thereafter, Aeronautica shall correct any defect covered by this Warranty by, at Aeronautica's option, arranging for the repair or replacement of the defective parts by Aeronautica personnel or Aeronautica-certified personnel either on site or at a location designated by Aeronautica. Aeronautica shall be responsible for the cost of replacement parts as well as labor costs (including travel and lodging costs), crane and other equipment usage and transportation costs, and shipping costs associated with any warranty repair or replacement. Notwithstanding the foregoing, the owner of the Wind Turbine shall be responsible for any costs that would cause Aeronautica's aggregate liability to exceed the liability cap specified herein and Aeronautica shall have no obligation to incur such excess costs absent arrangements satisfactory to Aeronautica for the payment of such excess costs. In the event a defect cannot be corrected by Aeronautica Windpower's reasonable efforts, the parties shall undertake in good faith to negotiate an equitable price adjustment.

*Exclusive Remedies and Warranties*. The preceding paragraphs of this Warranty set forth the exclusive remedies for all claims based on failure of or defect in the Wind Turbine, whether the failure or defect arises before or during the applicable warranty period and whether a claim, however instituted, is based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise. The Warranty set forth herein is exclusive, and in lieu of all other warranties and guarantees whether written, oral, implied or statutory. No implied statutory warranty of merchantability or fitness for a particular purpose shall apply.

*Limitation of Liability*. Aeronautica Windpower's liability under this Warranty shall terminate at the end of the applicable warranty period except with respect to warranty claims properly made prior to the expiration of the applicable warranty period. Without limiting the foregoing, and notwithstanding the pendency of any statute of limitations or repose, the owner of the Wind Turbine may not commence any legal action or proceeding arising from a dispute concerning this Warranty later than one (1) month following the expiration of the applicable warranty period. Notwithstanding anything to the contrary herein, Aeronautica shall not be liable for loss of profit or revenues, loss of product, loss of use of the work or any associated equipment, interruption of business, cost of capital, cost of replacement, downtime costs, increased operating costs, claims of the owner's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages, nor shall Aeronautica's aggregate liability under, arising from or in connection with this Warranty exceed the amount actually paid by the original Buyer to Aeronautica for the Turbine Equipment under the Agreement.

*Force Majeure*. A "Force Majeure Event" under the terms of this Warranty shall mean any cause or causes which (wholly or partly) prevent or delay the performance of Aeronautica's obligations arising under this Warranty and are due to causes beyond the reasonable control of Aeronautica. Such causes may include, without limitation, an act of God, explosion, accident, fire, epidemic, landslide, lightning, earthquake, storms, flood or similar cataclysmic occurrence; an act of the public enemy, war, terrorism, blockade, insurrection, riot, civil disturbance, sabotage, strikes, lockouts, or other labor difficulties; unavailability of labor, fuel, power or raw materials, plant breakdowns or equipment failure due to cause(s) beyond the reasonable control of Aeronautica; restrictions or restraints imposed by law or by rule, regulation or order of governmental authorities; action or failure to act of governmental authorities; interruption or other loss of utilities; shortage of materials by blade and tower manufacturers; and actions or omissions of the owner of the Wind Turbine or its contractors. If Aeronautica is rendered unable to perform its obligations under this warranty because of a Force Majeure Event, Aeronautica shall be excused from whatever performance is affected by the Force Majeure Event to the extent it is so affected provided that (1) Aeronautica, within a reasonable period after the occurrence of the inability to perform due to a Force Majeure Event, (i) provides written notice to the owner of the Wind Turbine of the particulars of the occurrence, including an estimation of the event's expected duration and probable impact on the performance of its obligation hereunder, and (ii) continues to furnish timely, regular reports with respect thereto during the period of Force Majeure; (2) Aeronautica shall exercise all reasonable efforts to continue to perform its obligations hereunder and remedy its inability to so perform; (3) Aeronautica shall provide the owner of the Wind Turbine with prompt notification of the cessation of the Force Majeure Event; and (4) no obligation that was breached prior to the occurrence of the Force Majeure Event shall be excused as a result of such occurrence.

*Dispute Resolution*. In the event of a dispute arising from this Warranty, the parties shall arbitrate the dispute under the Expedited Procedures and the General Commercial Rules of the American Arbitration Association. The arbitration shall be heard and determined by a single arbitrator who shall be a licensed attorney and shall take place in Boston Massachusetts at the office of counsel to Aeronautica Windpower. The provisions of this paragraph shall control over any inconsistent provisions in the Agreement.

*Governing Law; Venue*. This Warranty shall be construed and interpreted in accordance with the laws of the Commonwealth of Massachusetts without regard to principles of conflicts of laws. Any legal action or proceeding determined by the arbitrator to be not subject to arbitration with respect to this Warranty shall be brought in Boston, Massachusetts. The provisions of this paragraph shall control over any inconsistent provisions in the Agreement.

*Assignment*. This Warranty may only be assigned by the owner of the Wind Turbine to a purchaser of the Wind Turbine, provided that the Wind Turbine owner shall provide Aeronautica with prior written notice of such assignment. This Warranty may be assigned by Aeronautica Windpower to an affiliate or to a purchaser of substantially all of its assets.

EXCEPT AS SET FORTH HEREIN, AERONAUTICA MAKES NO EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE TURBINE EQUIPMENT, ITS CONDITION, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE BY BUYER. AERONAUTICA FURNISHES THIS WARRANTY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## Exhibit B

### WIND TURBINE GENERATOR 5-YEAR AVAILABILITY WARRANTY

*Performance Warranty*.  Aeronautica warrants that (i) from the Commissioning Date through the end of the six (6) month period immediately following such date (the "Initial Performance Warranty Period"), the average percentage of time on a rolling twelve-month basis in which the turbine will be capable of operating ("Availability") shall be at least 90%, and (ii) from the first day immediately following the Initial Performance Warranty Period until the fifth anniversary of the Commissioning Date, the Availability of its turbine shall be at least 95%. Actual performance shall be measured by the SCADA system, and measurements and calculations shall otherwise be made in accordance with Aeronautica's specifications. Time associated with the following events shall not be considered periods of unavailability in the calculation of Availability: scheduled maintenance or testing (not exceeding 110% of the estimated man-hours for performance of the maintenance or testing specified in the Aeronautica Standards); icing events; cessation of operation caused by owner or any third party, including operations settings specified by owner or any third party; or cessation of operation caused by Force Majeure Events, as defined in the primary warranty. In the event that a claim under this performance warranty arises, the Buyer shall promptly follow the warranty claims procedure described in the primary warranty and a breach of this performance warranty shall be treated as a defect under the primary warranty.

Damages under this Warranty shall be limited to the full value of turbine generation, at the $/kWh from which the Owner expected to benefit during the time of excessive unavailability.

*Except to the extent that the terms of this addendum expressly supersede the terms and conditions of the primary warranty, any additional warranty coverage described in this addendum is subject to all of the terms and conditions of the primary warranty.*

EXCEPT AS SET FORTH IN THIS ADDENDUM AND IN THE PRIMARY WARRANTY TO WHICH THIS ADDENDUM IS ATTACHED, AERONAUTICA MAKES NO EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE TURBINE EQUIPMENT, ITS CONDITION, MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR USE BY BUYER. AERONAUTICA FURNISHES THE  WARRANTY DESCRIBED IN THE PRIMARY WARRANTY AND THIS ADDENDUM IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## SUPPLY BOND

**Bond # K08615779**

KNOW ALL MEN BY THESE PRESENTS, That

Aeronautica Windpower, LLC – 11 Resnik Road, Plymouth, MA 02360 (herein called Principal), as Principal, and Westchester Fire Insurance Company, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania (herein called Surety), as Surety, are held and firmly bound unto Bearing Construction Company – 805 Shine Smith Road, Sudlersville, MD 21668 (Obligee), in the just and full sum of One Million Five Hundred Ninety Four Thousand Nine Hundred Thirty Eight and 00/100 ($1,594,938.00 ) Dollars, to the payment of which sum, well and truly to be made, the Principal and Surety bind themselves, and their respective heirs, administrators, executives, successors, and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal has entered into a certain written agreement with the Obligee dated August 30, 2013, to furnish the following briefly described supplies:

Crisfield Wind Energy Project, Contract No. 187A019; City of Crisfield, Maryland Wastewater Treatment Facility; Purchase Order #13160-01.

which contract is hereby referred to and made a part hereof as fully and to the same extent as if copied at length herein.

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if Principal shall fully indemnify and reimburse the Obligee for any loss that Obligee may suffer through the failure of the principal to furnish said supplies in accordance with the terms of said contract, at the time(s), and in the manner therein specified, then this obligation shall be void; otherwise it shall remain in full force and effect.

PROVIDED, HOWEVER, That this bond is subject to the following conditions:

1. It shall be a condition precedent to the right of recovery hereunder, that in the event of any default on the part of the Principal, a written statement of the particular facts showing the date and nature of such default shall be immediately delivered to the Surety by certified mail at its home office.

2. No claim, action, suit or proceeding shall be had or maintained against the Surety on this instrument unless the same be brought or instituted and process served upon Surety within six months after all the supplies that are to be furnished by the terms of said contract have been furnished; nor, in any event, shall any action, suit, or proceeding be had or maintained against Surety on this instrument, unless the same be brought or instituted and process served upon the Surety prior to the expiration of one year from the date fixed in said contract for the completion thereof.

3. In no event shall losses paid under this bond exceed the amount as set forth in this bond or the amount as set forth in any additions, riders, or endorsements, properly issued by the Surety as supplements thereto.

4. It is understood and agreed that any and all warranties and guarantees referenced in the underlying Contract will be excluded from the scope of coverage provided by this bond.

IN WITNESS WHEREOF, the Principal and Surety have signed and sealed this instrument this 14th day of October , 2013,

Principal    Aeronautica Windpower, LLC                (seal)

Surety    Westchester Fire Insurance Company

Jean M. Feeney, Attorney-In-Fact

**Exhibit C**

# Power of Attorney

## WESTCHESTER FIRE INSURANCE COMPANY

**Know all men by these presents:** That WESTCHESTER FIRE INSURANCE COMPANY, a corporation of the Commonwealth of Pennsylvania pursuant to the following Resolution, adopted by the Board of Directors of the said Company on December 11, 2006, to wit:

"RESOLVED, that the following authorizations relate to the execution, for and on behalf of the Company of bonds, undertakings, recognizances, contracts and other written commitments of the Company entered into the ordinary course of business (each a "Written Commitment"):

(1) Each of the Chairman, the President and the Vice Presidents of the Company is hereby authorized to execute any Written Commitment for and on behalf of the Company, under the seal of the Company or otherwise.

(2) Each duly appointed attorney-in-fact of the Company is hereby authorized to execute any Written Commitment for and on behalf of the Company, under the seal of the Company or otherwise, to the extent that such action is authorized by the grant of powers provided for in such person's written appointment as such attorney-in-fact.

(3) Each of the Chairman, the President and the Vice Presidents of the Company is hereby authorized, for and on behalf of the Company, to appoint in writing any person the attorney-in-fact of the Company with full power and authority to execute, for and on behalf of the Company, under the seal of the Company or otherwise, such Written Commitments of the Company as may be specified in such written appointment, which specification may be by general type or class of Written Commitments or by specification of one or more particular Written Commitments.

(4) Each of the Chairman, the President and Vice Presidents of the Company is hereby authorized, for and on behalf of the Company, to delegate in writing any other officer of the Company the authority to execute, for and on behalf of the Company, under the Company's seal or otherwise, such Written Commitments of the Company as are specified in such written delegation, which specification may be by general type or class of Written Commitments or by specification of one or more particular Written Commitments.

(5) The signature of any officer or other person executing any Written Commitment or appointment or delegation pursuant to this Resolution, and the seal of the Company, may be affixed by facsimile on such Written Commitment or written appointment or delegation.

FURTHER RESOLVED, that the foregoing Resolution shall not be deemed to be an exclusive statement of the powers and authority of officers, employees and other persons to act for and on behalf of the Company, and such Resolution shall not limit or otherwise affect the exercise of any such power or authority otherwise validly granted or vested."

Does hereby nominate, constitute and appoint Donald H McCarter, Jean M Feeney, John J Gambino, Kathleen M Flanagan, Michael J Cusack, Natalie Coneys, Nicholas Labbe, Nicole Roy, Richard A Leveroni, Sandra C Lopes, all of the City of BOSTON, Massachusetts, each individually if there be more than one named, its true and lawful attorney-in-fact, to make, execute, seal and deliver on its behalf, and as its act and deed any and all bonds, undertakings, recognizances, contracts and other writings in the nature thereof in penalties not exceeding Ten million dollars & zero cents ($10,000,000.00) and the execution of such writings in pursuance of these presents shall be as binding upon said Company, as fully and amply as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its principal office.

IN WITNESS WHEREOF, the said Stephen M. Haney, Vice-President, has hereunto subscribed his name and affixed the Corporate seal of the said WESTCHESTER FIRE INSURANCE COMPANY this 1 day of August 2013.

WESTCHESTER FIRE INSURANCE COMPANY



Stephen M. Haney , Vice President

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF PHILADELPHIA          ss.
     On this 1 day of August, A.D. 2013 before me, a Notary Public of the Commonwealth of Pennsylvania in and for the County of Philadelphia came Stephen M. Haney , Vice-President of the WESTCHESTER FIRE INSURANCE COMPANY to me personally known to be the individual and officer who executed the preceding instrument, and he acknowledged that he executed the same, and that the seal affixed to the preceding instrument is the corporate seal of said Company, that the said corporate seal and his signature were duly affixed by the authority and direction of the said corporation, and that Resolution, adopted by the Board of Directors of said Company, referred to in the preceding instrument, is now in force.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal at the City of Philadelphia the day and year first above written.



COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KAREN E. BRANDT, Notary Public
City of Philadelphia, Phila. County
My Commission Expires September 26, 2014

_Karen E Brandt_
Notary Public

I, the undersigned Assistant Secretary of the WESTCHESTER FIRE INSURANCE COMPANY, do hereby certify that the original POWER OF ATTORNEY, of which the foregoing is a substantially true and correct copy, is in full force and effect.

In witness whereof, I have hereunto subscribed my name as Assistant Secretary, and affixed the corporate seal of the Corporation, this 14th day of October, 2013

_William L. Kelly_
William L. Kelly, Assistant Secretary

THIS POWER OF ATTORNEY MAY NOT BE USED TO EXECUTE ANY BOND WITH AN INCEPTION DATE AFTER August 01, 2015.

FORM NO. 68005

Super Safety® ANTI-FRAUD PROTECTION

THE BACK OF THIS DOCUMENT LISTS VARIOUS SECURITY FEATURES          THAT WILL PROTECT AGAINST COPY COUNTERFEIT AND ALTERATION.

*U.S. GOVERNMENT PRINTING OFFICE 1987-756-453(60062)

FORM APPROVED
OMB NO. 0575-0042

USDA-FmHA
FORM FmHA 1924-7
(Rev. 2/87)

CONTRACT CHANGE ORDER

| CHANGE ORDER NO. |
|---|
| 2 |
| DATE |
| February 18, 2015 |
| STATE |
| Maryland |
| COUNTY |
| Somerset |

CONTRACT FOR:
Crisfield Wind Energy Project

OWNER:
City of Crisfield, Maryland

CONTRACTOR:
Bearing Construction Company

| Description of Changes<br>(Supplemental Plans and Specifications Attached) | DECREASE<br>In Contract Price | INCREASE<br>In Contract Price |
|---|---|---|
| Time Extension Only | | |
| TOTALS | $0.00 | $0.00 |
| NET CHANGE IN CONTRACT PRICE | $0.00 | |

JUSTIFICATION:

Time extension and contract modifications as stated and agreed to by all parties in the January 21, 2015 letter from City of Crisfield City Solicitor to Bearing Construction, attached.

The amount of the Contract will be Inceased By the Sum of:

Zero Dollars                                                                                                $0.00

The Contract Total Including this and previous Change Orders Will Be:

Three Million Two Hundred Thirteen Thousand Six Hundred Thirty Six and 70/100 Dollars        $3,213,636.70

The Contract Period Provided for Completion Will be Increased:                                  141 Days

The Contract Completion Date Shall be:                                                          May 22, 2015

**This document will become a supplement to the contract and all provisions will apply hereto.**

Requested _____ Mayor                    2-18-15
                        (Owner)                                (Date)

Recommended _____                         2-18-15
              (Owner's Architect/Engineer)                    (Date)

Accepted _____                            2-18-15
                  (Contractor)                                (Date)

This information will be used as a record of any changes to the original construction contract.

**Exhibit D**

LAW OFFICE

# COCKEY, BRENNAN & MALONEY, P. C.

ROBIN R. COCKEY
MARK P. BRENNAN
THOMAS I. MALONEY
HEATHER R. KONYAR
———
ASHLEY A. BOSCHÉ
LAURA E. HAY
MICHAEL P. SULLIVAN

313 LEMMON HILL LANE

SALISBURY, MARYLAND 21801

(410) 546-1750

FAX (410) 546-1811

rrcesq@cbmlawfirm.com
brennan@cbmlawfirm.com
tjmaloney@cbmlawfirm.com
konyar@cbmlawfirm.com

bosche@cbmlawfirm.com
hay@cbmlawfirm.com
msullivan@cbmlawfirm.com
WEBSITE: http://www.cbmlawfirm.com

January 21, 2015

Bearing Construction, Inc.
c/o Mr. Sam Merrell
805 Shine Smith Road
Sudlersville, Maryland 21668

*Re: Crisfield Wind Energy Project; Contract No. 187A019*

Dear Mr. Merrell,

Please be advised this law firm represents the City of Crisfield, Maryland.

I write in response to your December 17, 2015 letter in which you request an extension of One Hundred Fifty-Two (152) days to the duration of the Crisfield Wind Energy Project, Contract No. 187A019 (the "Contract"), by and between Bearing Construction, Inc. ("Bearing") and the City of Crisfield, Maryland (the "City") for the construction of the Crisfield Wind Energy Project (the "Project"). As you know, pursuant to the terms of the Contract, Bearing's completion of all work specified thereunder was to occur within 365 days following the Notice to Proceed, placing the date of the Project's completion on or about December 31, 2014. Needless to say, the City and its officials are very displeased with the untimely performance of the Project, as the Project represents one of the most (if not the most) important infrastructure projects in the City's history. Conservatively, once the Project is completed, the City expects to realize upwards of $12,000 per month in savings to its energy costs for operating the City's wastewater treatment plant. Indeed, the City has always planned to incorporate these savings into its FY 2015-2016 budget, and without these savings, the City will have to cut already-reduced services from its operating budget for the upcoming Fiscal Year. I provide you with this information to reiterate the importance of the Project's timely completion, and the obvious displeasure the City and its officials reasonably have at the significant type of extension Bearing has requested.

Nonetheless, the City and its officials recognize construction delays can occur. To that end, the City, without waiving any of its rights and interests under the Contract, and without releasing Bearing from any liability thereunder, is agreeable to extend the term of the Contract and not impose liquidated damages against Bearing for the delay (as is the City's right under Paragraph 4(A) of the General Conditions section of the Contract), pursuant to the following conditions:

1. Bearing will complete the Project in accordance with all terms of the Contract, on or before May 22, 2015. In the event the Project is not completed by May 22, 2015, Bearing shall pay liquidated damages, in the

amount of Two Thousand Dollars and 00/100 ($2,000.00), to the City for each and every day the Project is not completed after May 22, 2015.

2.    As soon as reasonably practicable, and no more than fifteen (15) days from the date of this letter's writing, Bearing will provide the City with a letter from the wind turbine manufacturer, Aeronautica, detailing: the nature of the delays with respect to the manufacturing of the wind turbine for the Project; when Aeronautica first became aware of any such manufacturing delays; the efforts Aeronautica has taken, and will take, to cure any such manufacturing delays; and, a schedule specifying the expected date for delivery of the wind turbine to the Project site.

3.    Bearing will provide the City with a revised schedule for construction of the Project, which shall provide for completion of the Project on or before May 22, 2015.

4.    At no cost to the City or its representative(s), Bearing will provide any and all necessary accommodations to Mr. Jason Loar, P.E. ("Mr. Loar"), the Project's engineer, to visit the facility at which the blades and/or nacelle of the wind turbine for the Project are manufactured, for the purpose of Mr. Loar viewing the status of the manufacturing of such items.

If Bearing is agreeable to these terms, please execute the line provided below for Bearing's signature. Upon receipt of this letter, executed by Bearing, the City will execute the line provided below for its signature, binding the parties to the terms set forth herein. This letter, as executed by Bearing and the City, will be attached as an exhibit to any and all change orders for the Project submitted to the Maryland Department of Environment by Mr. Loar and/or any agent of Mr. Loar or his employer, Davis, Bowen & Friedel, Inc.

On behalf of the City, thank you for your attention to this matter. Your prompt response is appreciated.

Sincerely,

Michael P. Sullivan

**BEARING CONSTRUCTION, INC.**

By: _____

Name: __Jim Merrell_____

Bearing Construction Inc., President

**CITY OF CRISFIELD, MARYLAND**

By: _____

Kimberly B. Lawson, Mayor

# CHRISTOPHER L. GRANT

ATTORNEY AT LAW
1250 CONNECTICUT AVENUE, N.W., SUITE 200
WASHINGTON, D.C. 20036
LAWGRANT@MINDSPRING.COM
HTTP://WWW.GRANTTOOLBOX.COM

ADMITTED IN:
D.C., MD.

TELEPHONE:(202) 737-0981
FACSIMILE: (202) 737-0982

September 28, 2015

Aeronautica Windpower, LLC
11 Resnik Road
Plymouth, MA 02360

via email: Tim.Stearns@aeronauticawind.com
walt.wunder@aeronauticawind.com

Westchester Fire Insurance Company
436 Walnut Street, Routing WB04H
Philadelphia, PA 19106

via email: Melissa.Detrick@ACEGroup.com

Re: Crisfield Wind Energy Project
Contract No. 187A019
City of Crisfield, Maryland Wastewater Treatment Facility
Purchase Order #13160-01
Supply Bond #K08615779

Aeronautica Windpower, LLC,
Westchester Fire Insurance Company:

Bearing Construction Inc. has received your letter dated September 22, 2015. Your letter provides us with details of the problems that Aeronautica encountered with the manufacturers of the nacelle, tower, blades, and bolts, but provides only a vague forecast of performance of your contract by the end of 2015. In order to assess our own position, we need to examine the details of the plans and arrangements that Aeronautica has made for the completion of this work. We require documentation of the contracts into which Aeronautica has entered with all manufacturers and vendors who are performing this work, including without limitation: Phoenix, Inc., Syncords, Molded Fiber Glass, and Randack, the supplier of bolts.

Please send copies of your contracts and your communications, including email messages, with each of these companies and any other companies who are performing work related to our project. Please send all schedules and documents pertaining to the schedule of performance of each of these companies. Please explain why each proposed schedule cannot be accelerated in order to mitigate the damages that we are incurring as the result of delay. As to each of these subcontractors and vendors, please provide the name and telephone number of a person in authority. Please send us your express permission to inquire directly with each such company about your contract, so that we

**Exhibit E**

Aeronautica Windpower, LLC
Westchester Fire Insurance Company
September 28, 2015
Page 2


can respond when the company asks us to show that they are authorized to share
information with us.

    We are concerned about the effects upon Aeronautica of this series of events.  We
need to establish that Aeronautica has the financial wherewithal to complete the
performance of our contract and to compensate us for its breaches of our contract.  We
request the following documentation of Aeronautica's current financial status:

- The most current balance sheet and income statement
- Financial statements audited or reviewed by a CPA for the most recent
  year that they are available
- Identification of the individual(s) or corporation(s) which serve as
  guarantors for Aeronautica's "Supply Bond" #K08615779

    The timely provision of all of this information is necessary to our assessment of
the steps that Aeronautica is taking to overcome its default of our contract.  We request
your response to this letter no later than October 9, 2015.  If we do not receive
Aeronautica's satisfactory response by that date, we shall call upon the surety for its
response.

                              Sincerely,

                              Christopher L Grant

                              Christopher L. Grant


cc:  Bearing Construction Inc.

## Christopher L. Grant

| | |
|---|---|
| **From:** | Christopher L. Grant <lawgrant@mindspring.com> |
| **Sent:** | Monday, September 28, 2015 3:24 PM |
| **To:** | Tim.Stearns@aeronauticawind.com; 'walt.wunder@aeronauticawind.com'; Melissa.Detrick@ACEGroup.com |
| **Cc:** | Jim Merrell (Jim@bearingconstruction.net) |
| **Subject:** | Crisfield Wind Energy Project |
| **Attachments:** | CCF09282015_0003.pdf |

Please see the attached letter.

Christopher L. Grant
Attorney at Law
1250 Connecticut Ave., N.W., Suite 200
Washington, D.C. 20036
Tel. (202) 737-0981
Fax (202) 737-0982
Cell (202) 487-6748
lawgrant@mindspring.com

1

# CHRISTOPHER L. GRANT

ATTORNEY AT LAW

1250 CONNECTICUT AVENUE, N.W., SUITE 200

WASHINGTON, D.C. 20036

LAWGRANT@MINDSPRING.COM

HTTP://WWW.GRANTTOOLBOX.COM

ADMITTED IN:
D.C., MD.

TELEPHONE:(202) 737-0981
FACSIMILE: (202) 737-0982

November 4, 2015

Aeronautica Windpower, LLC
11 Resnik Road
Plymouth, MA 02360

via certified mail
via email: Tim.Stearns@aeronauticawind.com
    walt.wunder@aeronauticawind.com

Westchester Fire Insurance Company
436 Walnut Street, Routing WB04H
Philadelphia, PA 19106

via certified mail
via email: Melissa.Detrick@ACEGroup.com

    Re:  Crisfield Wind Energy Project
        Contract No. 187A019
        City of Crisfield, Maryland Wastewater Treatment Facility
        Purchase Order #13160-01
        Supply Bond #K08615779

Aeronautica Windpower, LLC,
Westchester Fire Insurance Company:

    Aeronautica Windpower, LLC has defaulted in the performance of its contract
dated August 30, 2013. The contract, by incorporation of the prime contract documents,
required completion on or before December 31, 2014, the date which was 365 days
following the notice to proceed. The work of the contract remains uncompleted, and
Aeronautica has not made a commitment to any date for completion.

    Aeronautica Windpower, LLC and its surety have failed to respond adequately to
our letter dated September 28, 2015 and previous communications. Our letter dated
September 28, 2015 requested information and documents that would permit Bearing
Construction Inc. to examine the details of the plans and arrangements that Aeronautica
has made for the completion of its work. The letter requested documentation of the
contracts into which Aeronautica has entered with all manufacturers and vendors who are
performing this work. The letter requested copies of all schedules and documents
pertaining to the schedule of performance of each of these companies. The letter
requested an explanation of why each proposed schedule cannot be accelerated in order
to mitigate the damages that Bearing Construction is incurring as the result of delay.

Aeronautica Windpower, LLC
Westchester Fire Insurance Company
November 4, 2015
Page 2

The letter further requested information about the financial wherewithal of
Aeronautica to complete the performance of our contract and to compensate us for its
breaches of our contract. We requested the following documentation of Aeronautica's
current financial status:

- The most current balance sheet and income statement
- Financial statements audited or reviewed by a CPA for the most recent
  year that they are available
- Identification of the individual(s) or corporation(s) which serve as
  guarantors for Aeronautica's "Supply Bond" #K08615779

None of this information has been provided.

Bearing Construction will hold Aeronautica and its surety responsible for all of its
damages incurred as the consequence of Aeronautica's default, including without
limitation damages paid to the City of Crisfield for delay and Bearing's own damages.
Bearing calls upon Aeronautica and its surety to bring the project to the soonest possible
completion, and Bearing reiterates its request for the information and documents
requested in the letter dated September 28, 2015.

Sincerely,

Christopher L. Grant

Christopher L. Grant

cc: Bearing Construction Inc.
cc: Robert Riley, Esq.